FILED ✓   ENTERED   ___ RECEIVED   ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JAN 2 8 2016

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | 3:15-cr-007-RCJ-VPC |
| vs. | ) ) ) | **ORDER** |
| NELSON RAY McKEE, | ) ) | |
| Defendant. | ) ) ) | |

A grand jury has indicted Defendant Nelson Ray McKee, an Indian, on one count of Murder Within Indian Country, 18 U.S.C. §§ 1111, 1151, and 1153. Defendant has made eight motions in preparation for trial (ECF Nos. 15–22). For the reasons stated below, the Court grants the motions in part and denies the motions in part.

## I.    FACTS AND PROCEDURAL HISTORY

On December 31, 2014, Jason Manard, an officer for the Bureau of Indian Affairs, accompanied by Casey Negus and Kyle Negus, deputies for the Humboldt County Sheriff's Office, responded to an emergency call on the Fort McDermitt Indian Reservation. (Narrative, 4, 6, ECF No. 41-1; Incident Report, 3, ECF No. 41-2). The caller told the dispatcher a woman was pounding on the door and appeared to have been stabbed in the chest. (*Id.*) When the officers

arrived at the scene, they found Cheryl Jackson-McKee on the floor of the entry way "flailing about weakly and moaning." (Incident Report, 3). "She had blood on her left cheek" and "a wound in her upper left chest that was bleeding quite a bit." (*Id.*) The officers decided to find Jackson-McKee's husband, Defendant Nelson McKee, at the McKee residence located about eighty yards from the scene. (Narrative, 4, 6; Incident Report, 3). As the officers walked toward the house, they noticed fresh footprints in the snow leading from the McKee residence to the scene. (*Id.*). The footprints passed through an open gate separating the two residences, and the officers observed drops of blood on the snow by the gate. (*Id.*). When they approached the door of Defendant's home, Officer Manard noticed drops of blood at the base of the door's exterior. (Incident Report, 3).

The officers knocked on the door twice, and Defendant opened the door about forty-five seconds after the first knock. (Body Camera Video One of Deputy Kyle Negus ("Video"), DVD Bates No. USAO 00896, FILE0078, 22:21:21–22:22:06, ECF Nos. 40, 42). Officer Manard asked, "What's going on?" and Defendant replied, "Nothing." (*Id.* at 22:22:08). Officer Manard asked Defendant twice, "Why is Cheryl bleeding?" and said to him, "Cheryl's over there bleeding right now; we're trying to figure out why—did she fall over again or did something happen?" (*Id.* at 22:22:10–24). Amidst these questions, Deputy Kyle Negus asked, "Can we come in the house?" (*Id.* at 22:22:15). According to Officer Manard, he also asked for consent to enter and Defendant "invited us inside," (Incident Report, 3), by saying "something to the effect of 'come on in.'" (Hr'g, January 11, 2016, 14:50:53). The body camera Deputy Kyle Negus was wearing shows Defendant moved out of the doorway, and the officers entered the house. (Video,

22:22:30). Defendant then sat at a table where the officers observed a large bottle of whiskey and two knives, one of which appeared to be bent and the other appeared to have blood on it. (Incident Report, 3). The officers moved the knives from the reach of Defendant, ordered him to stand up, handcuffed him because he was balling up his fists, and had him sit down. (*Id.* at 3–4).

While Defendant was detained, Officer Manard asked many questions of Defendant and made statements to him, such as the following:

- "Why is there a bloody knife on your table?"
- "Nelson, what the hell happened?"
- "Cheryl's over there bleedin'; I've got a knife with blood all over it; I've got you sitting next to it."
- "Nelson, I need you to talk to me right now; what the fuck happened, dude?"
- "Nelson, seriously, what happened?"
- "Nelson, you're not under arrest right now, I'm trying to figure out what the fuck happened."
- "Nothing? Something happened, Nelson, she's over there bleeding."

(Video, 22:23:53–22:25:20). While the deputies searched the house for other occupants and found none, (*Id.* at 22:24:50–22:26:30), Officer Manard continued his questions and statements, including the following:

- "Why the fuck is she bleeding?"
- "You two didn't get in an argument?"
- "Did you cut her or did she cut herself?"
- "Did you watch her do it?"

(*Id.* at 22:26:33–22:30:00). During that exchange, Deputy Casey Negus was examining and reading papers on a table in the room. (*Id.* at 22:27:15–22:28:40).

1    The officers then placed Defendant under arrest for unlawful possession of alcohol. (*Id.*
2    at 22:29:15–22:30:10). Because they had observed blood on his socks, they removed them and
3    placed them in an evidence bag. (Narrative, 4; Incident Report, 4). As the officers prepared to
4    transport Defendant to jail, Defendant stated, "[Jason Manard] has tried me in federal court two
5    times . . . probably will be his third time he tries me," and Deputy Kyle Negus replied, "What
6    would he try and try you for this time? Why would he take you to court this time?" (Video,
7    22:38:00–22:39:20).

8    The next day, January 1, 2015, FBI agents obtained a search warrant and seized evidence
9    from Defendant's home. (Mot. to Suppress, 2, ECF No. 22). Agents also interviewed Defendant
10   while he was in jail. At 5:57 p.m., Defendant invoked his right to have an attorney present, and
11   the interviewer ceased the interrogation. (Tr. 2–3, ECF No. 39-3). However, Defendant
12   "continued to ask questions about the circumstances of his arrest and [was] told that the
13   interviewing Agents could not respond." (Doc, 1, ECF No. 39-4). At 6:18 p.m., Defendant stated
14   that he wanted to speak with the agents and confirmed that the agents had not asked to continue
15   the conversation after Defendant had asked for an attorney. (Tr. 2, ECF No. 39-5). Defendant
16   said he had changed his mind. (*Id.*) The officers then re-read Defendant's *Miranda* rights to him,
17   and Defendant initialed and signed a waiver form. (*Id.* at 3; Waiver Form, ECF No. 39-5).

18   Defendant has made the following eight motions: (1) motion for notice of intent to
19   introduce evidence under FRE 404(b); (2) a *Henthorn* motion; (3) motion to strike surplusage
20   from the indictment; (4) motion to use the Elko Division Master Jury Wheel; (5) motion to
21   permit attorneys to ask further questions of jurors under Rule 24(a); (6) motion to use a case-
22
23
24

1   specific jury questionnaire; (7) motion to suppress statements for Fifth Amendment violations;

2   (8) motions to suppress evidence for Fourth Amendment violations.

## II.   MOTION FOR NOTICE OF INTENT TO INTRODUCE EVIDENCE UNDER FRE 404(b)

Defendant asks the Court to order the Government to provide thirty days' notice of any evidence it intends to introduce at trial under Rule 404(b) (ECF No. 15). At a defendant's request, Rule 404(b) requires a prosecutor to give "reasonable notice" of its intent to offer evidence of "a crime, wrong, or other act" for a permissible use, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Government does not oppose the motion, and the Court finds thirty days to be reasonable. The Court grants the motion and orders the Government to provide thirty days' notice of any evidence it intends to introduce at trial under Rule 404(b). In addition, the Government shall provide prompt notice if it discovers any such evidence within thirty days of trial.

## III.   *HENTHORN* MOTION

Defendant moves the Court to order the Government to inspect and produce the personnel files of all federal agents and officers it intends to call as witnesses at trial (ECF No. 16). When a defendant requests access to the personnel files of testifying officers for the purposes of identifying exculpatory information, i.e., impeachment information, the government must examine the personnel files itself and disclose any material information that is favorable to the defendant. *United States v. Henthorn*, 931 F.2d 29, 30–31 (9th Cir. 1991); *see also Giglio v.*

*United States*, 405 U.S. 150, 154–55 (1972); *Brady v. Maryland*, 373 U.S. 83, 87 (1963). If the prosecution is uncertain as to whether the information is material, "it may submit the information to the trial court for an in camera inspection and evaluation." *Henthorn*, 931 F.2d at 31 (quoting *United States v. Cadet*, 727 F.2d 1453, 1467–68 (9th Cir. 1984)). A defendant has no burden to make an initial showing of materiality; the mere demand to produce the files triggers the government's duty to examine the files. *Id.* However, the attorney assigned to a case need not personally review the files. *United States v. Jennings*, 960 F.2d 1488, 1491–92 & n.3 (9th Cir. 1992). Following its examination, the prosecution need not furnish the files "to the defendant or the court unless they contain information that is or may be material to the defendant's case." *Henthorn*, 931 F.2d at 31.

Contrary to *Henthorn*, Defendant asks the Court to order the Government to produce the files of all agents and officers the Government intends to call as witnesses at trial. *Henthorn* requires the prosecution to furnish only files it believes "contain information that is or may be material to the defendant's case." *Id.* Thus, the Court grants the motion inasmuch as it requires the Government to review personnel files and furnish those it believes may contain material information, an obligation with which the Government has indicated it intends to comply. (*See* Resp., 3, ECF No. 37). The Court denies the motion inasmuch as Defendant's request exceeds the Government's obligations as identified in *Henthorn*.

## IV.   MOTION TO STRIKE SURPLUSAGE FROM INDICTMENT

Defendant moves to strike as surplusage the words "willfully and" from the indictment (ECF No. 17). Under federal rules, "[u]pon the defendant's motion, the court may strike

1   surplusage from the indictment or information." Fed. R. Crim. P. 7(d). The purpose of this rule is

2   "to protect a defendant against prejudicial or inflammatory allegations that are neither relevant

3   nor material to the charges." *United States v. Laurienti*, 611 F.3d 530, 546–47 (9th Cir. 2010)

4   (quoting *United States v. Terrigno*, 838 F.2d 371, 373 (9th Cir. 1988)).

5          The indictment contains the following language: Defendant "willfully and with malice

6   aforethought, did unlawfully kill [the victim]." (ECF No. 1).  Defendant argues the indictment

7   charges murder in the second degree, not in the first degree, because although it includes the

8   term "willfully" it does not contain the phrase "with premeditation." As a result, Defendant asks

9   the Court to strike "willfully and" from the indictment to eliminate confusion. The Government

10  does not oppose the motion. (Resp., 1, ECF No. 27).

11         The Government agrees that the indictment charges Defendant with murder in the second

12  degree, not in the first degree. The phrase "willfully and" is neither relevant nor material to the

13  charge of second-degree murder; thus, the Court grants the motion in the interest of protecting

14  Defendant from prejudicial allegations and avoiding jury confusion.

15  **V.     MOTION TO USE ELKO DIVISION MASTER JURY WHEEL**

16         Defendant asks the Court to use the Elko Division Master Jury Wheel for jury selection

17  to avoid excluding from the jury pool "the very distinct and sovereign Indian Country Political

18  Community (the Fort McDermitt Pa[iu]te-Shoshone Tribe of Nevada and Oregon) from which

19  the alleged crime arises." (Mot., 7, ECF No. 18). Defendant points out that in a prior criminal

20  case involving Defendant the Court granted Defendant's motion to use the Elko Division Master

21

22

23

24

1   Jury Wheel. *See United States v. McKee*, 3:09-cr-048-ECR-RAM, ECF Nos. 20, 40. The

2   Government does not oppose the motion. (Resp. 1, ECF No. 28). The Court grants the motion.

3   **VI.     MOTIONS TO PERMIT ATTORNEYS TO ASK FURTHER QUESTIONS OF**

4   **JURORS UNDER RULE 24(a) AND TO USE A CASE-SPECIFIC JURY**

5   **QUESTIONNAIRE**

6           Defendant moves the Court to permit the attorneys to examine prospective jurors under

7   Federal Rule of Criminal Procedure 24(a) (ECF No. 19) and to use a case-specific questionnaire

8   as part of voir dire (ECF No. 20). The Court denies both motions.

9           Prior to trial, the parties will have the opportunity to submit to the Court proposed voir

10  dire questions. The Court will review the proposed questions and determine whether to pose

11  them to prospective jurors at the time of jury selection. The Court's questioning during voir dire

12  will provide sufficient constitutional safeguards to ensure that a fair and impartial jury is

13  selected.

14  **VII.    MOTION TO SUPRESS STATEMENTS**

15          Defendant moves to suppress statements he made while in his home and in jail for

16  violations of the Fifth Amendment (ECF No. 21). The Court grants the motion in part and denies

17  the motion in part.

18          **A.      Legal Standards**

19          The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal

20  case to be a witness against himself." U.S. Const. amend. V. To secure this privilege against self-

21  incrimination, "the prosecution may not use statements, whether exculpatory or inculpatory,

22

23

24

1  stemming from the custodial interrogation of the defendant unless it demonstrates the use of

2  procedural safeguards," including the use of specific warnings.[1] *Miranda v. Arizona*, 384 U.S.

3  436, 444 (1966). "The defendant may waive . . . these rights, provided the waiver is made

4  voluntarily, knowingly and intelligently." *Id.*

5      A person is "in custody" for the purposes of *Miranda* if there was "a formal arrest or

6  restraint on freedom of movement of the degree associated with a formal arrest." *Thompson v.*

7  *Keohane*, 516 U.S. 99, 112 (1995) (citations omitted). In other words, "given th[e]

8  circumstances, would a reasonable person have felt he or she was not at liberty to terminate the

9  interrogation and leave." *Id.*; *see also United States v. Medina-Villa*, 567 F.3d 507, 519 (9th Cir.

10  2009) ("The subject of the inquiry is 'whether a reasonable innocent person in such

11  circumstances would conclude that after brief questioning he or she would not be free to leave.'"

12  (quoting *United States v. Booth*, 669 F.2d 1231, 1235 (9th Cir.1981))). A person can be in

13  custody in his or her own home, *Orozco v. Texas*, 394 U.S. 324 (1969) (a defendant questioned

14  in his bedroom by four officers was "in custody"), but "[a]n interrogation conducted within the

15  suspect's home is not *per se* custodial," *United States v. Craighead*, 539 F.3d 1073, 1083 (9th

16  Cir. 2008). To determine whether an in-home interrogation was custodial, the courts "consider[]

17

18  [1] As spelled out in *Miranda*:

19          [A defendant] must be warned prior to any questioning that [1] he has the right to
         remain silent, [2] that anything he says can be used against him in a court of law,

20          [3] that he has the right to the presence of an attorney, and [4] that if he cannot
         afford an attorney one will be appointed for him prior to any questioning if he so

21          desires.

22  *Id.* at 479.

23

24

the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *Id.* at 1083. This determination "'is necessarily fact intensive,'" *id.* at 1084 (quoting *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993)), and can include, among other factors, the following:

> (1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made.

*Id.*

"Interrogation" for the purposes of *Miranda* means "express questioning" and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "General on-the-scene questioning as to facts surrounding a crime" is not "interrogation." *Miranda*, 384 U.S. at 477–78. Volunteered statements that are not made in response to interrogation are admissible, however, even when a suspect is in custody and after he invokes his rights. *Klamert v. Cupp*, 437 F.2d 1153, 1154 (9th Cir. 1970) (citing *Miranda*, 384 U.S. at 478). Once a suspect unambiguously requests counsel, *Davis v. United States*, 512 U.S. 452, 459 (1994), "the interrogation must cease until an attorney is present," *Miranda*, 384 U.S. at 474. If a defendant's "'right to cut off questioning' was 'scrupulously honored,'" *Michigan v. Mosley*, 423 U.S. 96, 104 (1975), a defendant can subsequently waive that right if "the accused himself initiates further communication, exchanges, or conversations with the police," whereas a waiver is invalid when

a defendant merely "respond[s] to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).

*Miranda* warnings are not required "when 'police officers ask questions reasonably prompted by a concern for the public safety.'" *Allen v. Roe*, 305 F.3d 1046, 1050 (9th Cir. 2002) (quoting *New York v. Quarles*, 467 U.S. 649, 656 (1984)). This public-safety exception applies when there is "'an objectively reasonable need to protect the police or the public from immediate danger.' That is, the police must reasonably believe that there is a serious likelihood of harm to the public or fellow officers." *Id.* (quoting *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994)). Further, "[t]here is no custodial interrogation when asking what happened in an emergency situation." *Vickers v. Stewart*, 144 F.3d 613, 616–17 (9th Cir. 1998).

A defendant's statements to police must be made voluntarily. *Miranda*, 282 F.3d at 461–62. "A confession made in a drug or alcohol induced state . . . may be deemed voluntary if it remains 'the product of a rational intellect and a free will.'" *United States v. Banks*, 282 F.3d 699, 706 (9th Cir. 2002), *rev'd on other grounds*, 540 U.S. 31 (2003) (quoting *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir.1989)). Factors to consider when determining the voluntariness of statements include the defendant's general demeanor and whether the defendant was able to obey the officers' orders and instructions, answer questions, cooperate in conversing with the officers, and understand the circumstances. *Id.*; *Medeiros*, 889 F.2d at 823.

///

///

///

**B.      Analysis**

Defendant asks the Court to supress statements he made on two separate occasions: (1) statements made in his home on December 31, 2014; and (2) statements made in jail in Humboldt County on January 1, 2015.

**1.      Statements Made in Defendant's Home on December 31, 2014**

Defendant was not in custody for purposes of *Miranda* when the officers initially knocked on his door and conversed with him. Three officers knocked on the door of Defendant's home and asked him several questions. (Video, 22:22:08–22:22:24). Defendant was home alone, and the officers did not inform him he was free to terminate the interview, *id.*; however, the atmosphere was initially not "police-dominated." Before the officers entered, they exhibited no forceful, intimidating, or aggressive behavior. For example, they did not restrain Defendant or yell at him. Indeed, they were respectful of Defendant and did not use an accusatory or demanding tone in speaking with him. A reasonable person in these circumstances would feel free to terminate the encounter. However, shortly after the officers entered Defendant's home, they saw two knives on the kitchen table where Defendant was seated, and quickly required Defendant to stand up, handcuffed him, and then made him sit down. (*Id.* at 22:22:30–22:24:05; Incident Report, 3–4). Thus, at this point, just seconds after the officers entered Defendant's home, he was in custody for purposes of *Miranda*.

Throughout the interaction between the officers and Defendant, the officers engaged in express questioning they knew would be "reasonably likely to elicit an incriminating response

from the suspect." *Innis*, 446 U.S. at 300–01. For example, they asked the following questions of Defendant:

- "Why is Cheryl bleeding?"
- "Did she fall over again, or did something happen?"
- "Why is there a bloody knife on the table?"
- "I need you to talk to me; what the hell is going on? Why is there a bloody knife on the table?"
- "Nelson, I need you to talk to me right now; what the fuck happened, dude?"
- "Nelson, seriously, what happened?"
- "You two didn't get in an argument?"
- "Did you cut her or did she cut herself?"
- "Did you watch her do it?"
- "Then how do you know she cut herself?"
- "What would [Officer Manard] try and try you for this time? Why would he take you to court this time?"

(Video, 22:22:10–22:27:00; 22:38:40–22:39:20). Any officer would know these types of questions would likely elicit an incriminating response, along with the following statements the officers made:

- "Cheryl's over there bleeding; I've got a knife with blood all over it; I've got you sitting next to it."
- "Nothing? Something happened, Nelson, she's over there bleeding."
- "Understand something: the only reason I'm over here is 'cause Cheryl just ran across the fuckin' back yard over here, banged on Phillip's door, she's bleeding all over the front fuckin' porch, EMS is over there trying to patch her up . . . ."
- "I can't figure out what the fuck happened; I don't know if she got stabbed or she cut herself. You're not being very helpful."

1    (*Id.* at 22:24:30–22:30:15).

2         Although these questions and statements constitute interrogation while Defendant was in

3    custody, the public-safety exception applies to the first portion of the officers' interrogation. Any

4    reasonable officer would have believed there was a serious likelihood of harm to the public or

5    themselves when they found Defendant's wife on the ground with a stab wound, followed tracks

6    and drops of blood in the snow to Defendant's house, and saw blood at the base of the front door.

7    When they knocked on the door, they did not know what had happened, whether a perpetrator

8    might be lurking about the home, or whether weapons were in the area. During this emergency

9    situation, the public-safety exception covers any questions the officers asked to determine what

10   had happened and whether any ongoing threats to safety persisted.

11        The public-safety exception does not apply, however, once the emergency situation

12   ended. After the officers entered Defendant's home, detained Defendant, searched the home for

13   other individuals, and had custody of the knives, an emergency situation no longer existed. They

14   knew the knives, one of which appeared to be bent and the other of which appeared to have

15   blood on it, (Incident Report, 3), were likely used to harm Defendant's wife. The knives were in

16   their control, and they knew no one else was in the house. At that point, the officers also acted

17   without urgency, appearing to have no suspicion of any impending threat to safety.

18        Despite this change in circumstances, the officers continued to interrogate Defendant

19   about what had happened and what role he played in the events, without informing him of his

20   *Miranda* rights. They asked, for example:

21        •  "You two didn't get in an argument?"

22

23

24                                                 **14 of 33**

1   • "Did you cut her, or did she cut herself?"

2   • "What would he try and try you for this time? Why would he take you to court this

3       time?"

4   (Video, 22:26:40–22:26:50; 22:38:40–22:39:20). They also continued to make statements they

5   knew could have elicited an incriminating response, such as "Cheryl's over there bleeding; I've

6   got a knife with blood all over it; I've got you sitting next to it," and "I can't figure out what the

7   fuck happened; I don't know if she got stabbed or she cut herself. You're not being very

8   helpful." (*Id.* at 22:24:30; 22:30:09).

9           The public-safety exception does not cover any questions or statements the officers made

10  after the emergency situation had ended. As a result, the Court must suppress any statements

11  Defendant made in response to those questions and statements because the officers violated

12  Defendant's privilege against self-incrimination under the Fifth Amendment.

13          Defendant also argues his statements were given involuntarily because he was

14  intoxicated. The body camera video clearly shows, and the officers reported, that Defendant was

15  intoxicated during the interrogation. (*Id.* at 22:22:00–22:31:00; Incident Report, 6). Nevertheless,

16  Defendant's statements were the product of a rational intellect and free will. Defendant was able

17  to follow the officers' orders to sit down, stand up, and put his hands behind his back. (*Id.* at

18  22:22:30–22:24:05). He provided cogent answers to their questions. For instance, when asked

19  whether he cut his wife or she cut herself, he responded that she had cut herself. (*Id.* at 22:26:40–

20  22:27:10). He also asked questions of the officers, such as what charges they were bringing

21  against him, and whether he could get his shoes and sweatshirt. (*Id.* at 22:23:50; Body Camera

22

23

24                                    15 of 33

1   Video Two of Deputy Kyle Negus, DVD Bates No. USAO 00896, FILE0079, 22:42:20;

2   22:43:05, ECF Nos. 40, 42). Although Defendant was intoxicated, his statements were the

3   product of a rational intellect and free will; thus, his intoxication argument does not require the

4   suppression of further statements.

5          Defendant was subject to custodial interrogation for purposes of *Miranda* within seconds

6   after the officers entered his home. The public-safety exception applies to statements Defendant

7   made before the officers restrained Defendant, took control of the knives, and did a sweep of the

8   home. The Court grants in part the motion to suppress Defendant's statements under the Fifth

9   Amendment. Any statements made after the emergency situation had ended are suppressed,

10  whereas any statements made before that time are not.

11         **2.     Statements Made in Jail in Humboldt County on January 1, 2015**

12         Defendant argues his statements made while in jail on January 1, 2015 should be

13  suppressed because they were involuntary. Defendant infers that in exchange for his cooperation

14  by answering questions from federal agents, he was promised no new tribal charges would be

15  made against him. The Government argues this inference is speculative and the "fantasy and the

16  product of his imagination." (Resp., 9–10, ECF No. 39). The Court agrees that the inference is

17  highly speculative.

18         The record shows no evidence that officers promised Defendant that no new tribal

19  charges would be made against him if he cooperated by answering their questions. According to

20  the record, at 5:57 p.m. Defendant met with officers who read him his *Miranda* rights, and

21  Defendant indicated that he understood them. (Tr. 2–3, ECF No. 39-3). Defendant then invoked

22

23

24                                              16 of 33

his right to have an attorney present. (*Id.* at 2). The interviewer immediately ceased the interrogation. (*Id.* at 3). At that point, Defendant had said nothing about the offense alleged against him or the events in question. (Special Agent Mike Spitzer, Hr'g, January 11, 2016, 15:51:50–15:52:38). Defendant, however, "continued to ask questions about the circumstances of his arrest and [was] told that the interviewing Agents could not respond." (Doc., 1, ECF No. 39-4). At 6:18 p.m., Defendant stated he wanted to speak with the agents, and he confirmed that the agents did not ask to continue speaking with him once he had asked for an attorney. (Tr. 2, ECF No. 39-5). Defendant said he changed his mind. (*Id.*) The officers then re-read Defendant's *Miranda* rights to him, and Defendant initialed and signed a waiver form. (*Id.* at 3; Waiver Form, ECF No. 39-5). The agents testified that at no point did they raise the subject of tribal charges or imply that if Defendant agreed to interview with them he would be let out of custody. (Spitzer, Hr'g, January 11, 2016, 15:52:40–15:53:03, 16:11:14; Ricco Rondeaux, Hr'g, January 11, 2016, 16:19:14).

The officers scrupulously honored Defendant's assertion of his right to cut off questioning. Defendant then waived that right by initiating of his own accord further communication with the officers and by soliciting information from them. On the record, he admitted the officers did not initiate the renewed conversation. Defendant's inference that he was induced to waive his rights by a promise of no further tribal charges is not supported by any facts or evidence presented. In fact, the interviewing agents specifically testified they did not discuss tribal charges with Defendant. Defendant's waiver of his rights was voluntary, knowing, and

intelligent. The Court denies the motion to suppress Defendant's statements made in jail on January 1, 2015.

Defendant's motion to suppress evidence under the Fifth Amendment is granted as pertaining to statements made in his home after the officers had detained him and searched his home; however, the motion is denied as pertaining to statements made before that time, and also while Defendant was in jail in Humboldt County on January 1, 2015.

## VIII.   MOTION TO SUPRESS EVIDENCE

Defendant moves to suppress certain evidence seized in his home on December 31, 2014 and January 1, 2015 (ECF No. 22). He argues officers entered his home, searched it, and seized evidence in violation of the Fourth Amendment. Defendant asks the Court to suppress the following items, and any forensic testing resulting from them, as fruits of an illegal search: two kitchen knives; one pair of white socks; one pink blanket; fourteen papers with handwriting; swabs of the kitchen floor and the threshold of the front door; color photographs taken inside the home; observations made or captured by agents in the home; and the custodial interrogation conducted in the home. The Court denies the motion.

### A.   Search and Seizure

Evidence obtained by the Government in violation of the Fourth Amendment is generally inadmissible against an accused in a federal criminal trial. *Weeks v. United States*, 232 U.S. 383, 393–99 (1914). Before searching a person's home, the Government must obtain a search warrant based on probable cause and issued by a neutral and detached magistrate; warrantless home searches are presumptively unreasonable. *See* U.S. Const. amend. IV; *Payton v. New York*, 445

1   U.S. 573, 586 (1980). However, a warrantless search of a home can be permissible under "a

2   narrow set of rigorously guarded exceptions." *United States v. Stafford*, 416 F.3d 1068, 1073

3   (9th Cir. 2005). These exceptions include voluntary consent, the emergency doctrine, and exigent

4   circumstances.

5       **1.**    **Voluntary Consent**

6       Warrantless searches can be valid "with the voluntary consent of an individual possessing

7   authority." *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citations omitted). To prove

8   voluntary consent, the Government must prove a defendant gave "'unequivocal and specific'"

9   consent and that it was given "'freely and intelligently.'" *United States v. Shaibu*, 920 F.2d 1423,

10   1426 (9th Cir. 1990) (quoting *United States v. Page*, 302 F.2d 81, 83–84 (9th Cir. 1962)). In

11   "very limited circumstances . . . courts will infer consent from the cooperative attitude of a

12   defendant," *United States v. Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984), but the Government's

13   burden of proof "is heavier where consent is not explicit, since consent 'is not lightly to be

14   inferred,'" *id.* (quoting *United States v. Patacchia*, 602 F.2d 218, 219 (9th Cir. 1979)). Whether

15   consent was given is based on the totality of the circumstances. *Id.* at 1234 (citing *Schneckloth v.*

16   *Bustamonte,* 412 U.S. 218, 227 (1973)).

17       Defendant argues he did not consent to the officers' entry into his home. Specifically, he

18   relies on *Shaibu* and *United States v. Albrektsen*, 151 F.3d 951, 956 (9th Cir. 1998), to argue he

19   did not give implied consent to enter his home. In *Shaibu*, the defendant did not consent to enter

20   his home when he walked into his house, leaving the door open, and police followed him inside

21   without requesting permission to enter. 920 F.2d at 1424. The court held that "in the absence of a

22

23

24                                  

1    specific request by police for permission to enter a home, a defendant's failure to object to such

2    entry is not sufficient to establish free and voluntary consent. We will not infer both the request

3    and the consent." *Id.* at 1428. In *Albrektsen*, the defendant did not consent to the officers' entry

4    when the defendant moved aside to avoid being knocked down by the officers. 151 F.3d at 955.

5    In contrast, in *United States v. Garcia*, 997 F.2d 1273 (9th Cir. 1993), "the officers tricked

6    Garcia into opening the door, grabbed the door, flashed a badge and said, 'we'd like to talk to

7    you.' Garcia said, 'okay,' nodded and stepped back." *Id.* at 1281. The Ninth Circuit found that

8    "the officers' request to talk, combined with Garcia's affirmative response and step back clearing

9    the way for the officers' entry are sufficient to give rise to an inference of consent." *Id.*

10         The Court finds that Defendant consented to the officers' entrance into his home. The

11   body camera video shows the officers knocked on the door several times, and then Defendant

12   opened the door. (Video, 22:21:20–22:22:05). At the door, Officer Manard asked Defendant,

13   "What's going on?" and "Why is Cheryl bleeding?" (*Id.* at 22:22:05). Deputy Kyle Negus, the

14   officer with the body camera, was not on the porch but asked with a slightly raised voice, "Can

15   we come in the house?" (*Id.* at 22:22:15). Shortly after Deputy Negus's question, Officer Manard

16   said something to Defendant, but his voice is muffled and barely audible. (*Id.*). Deputy Kyle

17   Negus then walked to the side of the house, which caused Defendant's voice to become

18   inaudible, and the voices of the other officers remained quieter and muffled. (*Id.* at 22:22:20–

19   22:22:30). When the door becomes visible again in the video, the other officers are entering the

20   house after Defendant has already returned to the interior of his home. (*Id.* at 22:22:30). Thus,

21   the body camera video does not show definitively whether Officer Manard requested

22

23

24

1    Defendant's consent to enter or whether Defendant verbally or physically consented to the

2    officers' entrance.

3              The officers' reports provide more information about what occurred. According to a

4    report by Deputy Kyle Negus, "I then asked if we could come in the house and a few seconds

5    later Officer Manard asked if we could come in. Officer Manard entered the home followed by

6    Deputy Casey Negus." (Narrative, 4, ECF No. 41-1). Officer Manard reported, "I then asked if I,

7    along with the two deputies, could enter his residence and he invited us inside." (Incident Report,

8    3, ECF No. 41-2). In addition, the following testimony was given during an evidentiary hearing:

9    • "I heard Officer Manard ask if we can come in the house." (Deputy Kyle Negus, Hr'g,

10      January 11, 2016, 14:12:45);

11   • "I did ask if I could come inside of the home." (Officer Manard, *id.* at 14:49:48);

12   • "Kyle Negus asked if we could come inside followed by Officer Manard asking

13      [Defendant] if we could come inside." (Deputy Casey Negus, *id.* at 15:26:02).

14
     Exactly how Defendant responded is unclear. Officer Manard testified that Defendant replied by

15   saying "something to the effect of 'come on in.'" (*Id.* at 14:50:53). Deputy Kyle Negus could not

16   hear Defendant's response from where he was standing. (*Id.* at 14:12:55). Deputy Casey Negus

17   testified at first that he could not recall whether Defendant responded to Manard's request to

18   enter, (*id.* at 15:26:10), but later he stated that "Defendant said something," which Negus did not

19   understand, and then "[Defendant] invited us in, (*id.* at 15:35:07–15:41:50). After saying

20

21

22

23

24

1  whatever he said, Defendant turned away and walked into his home.[2] Also, Defendant, not the

2  officers, opened the door after the officers knocked and the door stayed open until the officers

3  entered Defendant's home.[3]

4         The Court finds that, despite any minor discrepancies in the record, Deputy Kyle Negus

5  and Officer Manard both asked Defendant if the officers could enter Defendant's home.

6  Defendant then likely orally consented to their entry, turned around, and returned into his house.

7  The officers then followed Defendant through the open door. The Court finds no reason to

8  disbelieve Officer Manard's testimony that he asked for consent to enter Defendant's home and

9  that Defendant responded affirmatively by saying something and returning into his home. The

10  video does not show conclusively that Defendant consented, but it also does not show he did not

11  consent. While Deputy Kyle Negus was on the side of the house, a muffled discussion or

12  statement occurred on the porch during which Defendant could have given consent to enter.

13         The cases Defendant cites do not support his argument. In *Shaibu*, the Ninth Circuit held

14  that "in the absence of a specific request by police for permission to enter a home, a defendant's

15  failure to object to such entry is not sufficient to establish free and voluntary consent." 920 F.2d

16  at 1424. Here, two officers requested entrance into Defendant's home. In *Albrektsen*, the

17  defendant did not consent to the officers' entry when the defendant moved aside to avoid being

18  ────────────────

19  [2] Officer Manard: "Yes, he did turn away from me and began walking back into the home. . . . I
followed [Defendant] into the home." (*Id.* at 14:50:48). Deputy Casey Negus: "[Defendant]
stepped to the side, and we followed [Defendant] into the residence." (*Id.* at 15:26:22);

20  "[Defendant], when he was asked if we could come in, he said something to Officer Manard and
turned away and let us into the home." (*Id.* at 15:40:27).

21  [3] Officer Manard: "I believe [Defendant] opened the door." (*Id.* at 15:12:25). Deputy Casey
Negus: "[Defendant] opened the door, and the door stayed open as we entered the home." (*Id.* at

22  15:38:53).

23

24

1    knocked down by the officers. 151 F.3d at 955. Here, in contrast, Defendant clearly did not move

2    aside to avoid contact with the officers—he left the doorway, and the officers followed him into

3    his home. Finally, in *Garcia*, "the officers' request to talk, combined with Garcia's affirmative

4    response and step back clearing the way for the officers' entry [were] sufficient to give rise to an

5    inference of consent." 997 F.2d at 1281. Here, as in *Garcia*, the officers requested to enter,

6    Defendant cleared the way for them to do so, and Officer Manard reported that Defendant invited

7    them in. Based on case law and the facts, the Court finds that Defendant consented to the

8    officers' entry into his home.

9        Defendant argues his consent was involuntary because he was too intoxicated to consent.

10   Intoxication does not automatically render consent involuntary; it can be manifest in varying

11   degrees and is one factor to consider among the totality of the circumstances. *United States v.*

12   *Koshnevis*, 979 F.2d 691, 694 (9th Cir. 1992) (rejecting the defendant's claim he was too

13   intoxicated to consent when he "appeared alert and cooperative" and was "clear-minded enough

14   to construct several lies"); *see also United States v. Gay*, 774 F.2d 368, 376–77 (10th Cir. 1985)

15   (citing cases from other circuits finding that intoxication has varying degrees and does not alone

16   render consent invalid).

17       Defendant's intoxicated state did not render his consent involuntary. In *Gay*, the

18   defendant voluntarily consented to a search even though "he staggered and swayed, he used the

19   vehicle to support himself, and his speech was slurred" because he was able to answer questions,

20   produce his driver's license, and empty his pockets upon request. 774 F.2d at 376–77. Here,

21   although Defendant was clearly intoxicated, he was able to open the door, converse with the

22

23

24

officers, allow them to enter, and obey their orders. Defendant's choice to allow the officers to enter his home was given freely and intelligently and was the product of a rational intellect and free will. Defendant has presented no evidence to show otherwise.

2.    **Emergency Exception**

Even if Defendant did not consent to the officers' entry into his home, the emergency exception allowed the officers to enter his home without a warrant or his consent. Because of law enforcement officers' role as community caretakers, "[t]he emergency doctrine allows [them] to enter and secure premises without a warrant when they are responding to a perceived emergency." *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005). In *Stafford*, the Ninth Circuit determined that under the emergency doctrine, a warrantless search is justified if the following three requirements are satisfied:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Id.* at 1073–74 (quoting *United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir. 2000)). However, in *Brigham City, Utah v. Stuart*, 547 U.S. 398 (2006), the Supreme Court abrogated the second prong of the test. *See Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). According to the Court, "[t]he officer's subjective motivation is irrelevant." *Brigham City*, 547 U.S. at 404. Instead, "[a]n action is 'reasonable' . . . 'as long as the circumstances, viewed

1   *objectively*, justify [the] action.'" *Id.* (emphasis in original) (quoting *Scott v. United States*, 436

2   U.S. 128, 138 (1978)). Further, although a homicide scene alone does not create an emergency

3   situation that justifies a warrantless search, "when the police come upon the scene of a homicide

4   they may make a prompt warrantless search of the area to see if there are other victims or if a

5   killer is still on the premises." *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *see also Thompson*

6   *v. Louisiana*, 469 U.S. 17 (1984) (affirming *Mincey*). The analysis for the emergency exception

7   is based on the totality of the circumstances, and the Government bears the burden of

8   demonstrating the exception applies. *Stafford*, 416 F.3d at 1074.

9          The emergency exception applies to the officers' entry and search of Defendant's home.

10  A reasonable officer in the circumstances would have grounds to believe an ongoing emergency

11  required assistance to protect life or property. When the officers arrived on the scene, they found

12  Defendant's wife on the ground flailing, moaning, and unresponsive, apparently having been

13  stabbed. (Incident Report, 3; Video, 22:16:20). They decided to check on Defendant at his home,

14  which was about eighty yards away. (Narrative, 4, 6). They followed a trail of fresh foot prints in

15  the snow and noticed drops of blood in the snow next to an open gate. (*Id.*; Incident Report, 3).

16  At Defendant's house, they noticed blood in the door way. (Incident Report, 3). As they knocked

17  on the door, the officers did not know whether Defendant's wife had stabbed herself or someone

18  else had done it. They did not know where the weapon used to stab her was located. After

19  Defendant opened the door, the officers would have reasonably expected someone else to be in

20  the house after Officer Kyle Negus observed, "[S]omeone's fuckin' around by this window."

21

22

23

24

(Video, 22:21:52).[4] A reasonable officer would have viewed these circumstances as an emergency situation. He or she would have been concerned that a killer or other victims were in the house, particularly after Defendant opened the door in an intoxicated state and insisted that "[n]othing" had happened.[5] (Video, 22:22:06). As a result, the officers were justified in doing a prompt warrantless search of the home to determine if a killer occupied the house or if other victims were present.

During the evidentiary hearing, Defendant relied on *United States v. Dugger*, 603 F.2d 97 (9th Cir. 1979), to argue the emergency exception does not apply. In *Dugger*, officers arrived at an apartment complex where they interviewed the victim of an alleged assault resulting from a fistfight. *Id.* at 98. They then followed a trail of blood from the victim to the defendant's apartment where they observed blood on the front door. *Id.* After ringing the doorbell and hearing no response, an officer pushed the door open, stepped back, and called to the defendant. *Id.* After a moment, a male in the apartment said he would put his shoes on and come right out. *Id.* The court held that "once the officers heard Dugger respond from within that he was coming outside as soon as he put on his shoes, any excuse of an emergency dissipated." *Id.* at 99–100. The court also noted that no evidence indicated that the victim or another individual "told the

---

[4] During the evidentiary hearing, Deputy Kyle Negus testified: "I noticed someone moving the blinds at the window facing on the south side of the house." (Hr'g, January 11, 2016, 14:11:12–14:11:20).

[5] Defendant could argue the officers were intent on finding him, suspecting him as the perpetrator of the stabbing, and, thus, they entered and searched his home with the intent to find evidence that he committed the crime rather than to do a cursory search for a killer or other victims; however, "[t]he officer's subjective motivation is irrelevant." *Brigham City*, 547 U.S. at 404.

1   officers that Dugger was armed or injured or that any other persons were injured in the fight." *Id.*

2   at 100, n.5.

3       *Dugger* and this case have similarities. As in *Dugger*, the officers here followed a trail of

4   evidence (blood drops and foot prints) to Defendant's house and then were able to speak with

5   Defendant. However, the cases are different in four important aspects. First, *Dugger* involved an

6   assault whereas this case involves a stabbing and murder. The officers here knew the victim had

7   been stabbed in the chest and could soon die. She was flailing and moaning and was

8   unresponsive. A stabbing resulting in death creates a much more serious emergency situation

9   than an assault resulting from a fistfight. As *Mincey* indicated, a homicide scene justifies "a

10   prompt warrantless search of the area to see if there are other victims or if a killer is still on the

11   premises." 437 U.S. at 392. Second, although the officers were speaking with Defendant at the

12   door and knew he was not in need of immediate aid, they knew that "someone [was] fuckin'

13   around by th[e] window," (Video, 22:21:52), and, thus, that a person other than Defendant might

14   have been inside. In *Dugger*, no evidence indicated that another person could be inside. Third,

15   the defendant in *Dugger* simply said he would put his shoes on and come outside, whereas here

16   Defendant said "nothing" had happened, which would have done little or nothing to dissipate the

17   emergency situation resulting from a stabbing. Fourth, in *Dugger* the officers were able to

18   interview the victim, and no evidence indicated that the defendant was armed or injured or that

19   other individuals were injured. Here, in contrast, the victim was unresponsive and, therefore,

20   unable to tell the officers what had happened. She provided no information to help dissipate the

21   emergency situation. The officers did know that at least one person had been stabbed using a

22

23

24

weapon they had not yet located, and that the victim had come from Defendant's home. Thus, when the officers knocked on the door of Defendant's home, the emergency situation was ongoing and more serious than the situation in *Dugger*. In contrast to the situation in *Dugger*, the emergency situation here justified a prompt warrantless search of Defendant's home.

The initial cursory search of Defendant's home was also appropriate. Once inside Defendant's house, the officers found the two knives, questioned Defendant about whether anyone else was in the house and what had happened, and performed a prompt search of the house. In *Thompson*, officers responded to a report of homicide and performed a cursory search of the home. 469 U.S. at 18. Thirty-five minutes later, two investigators arrived to conduct a follow-up investigation of the homicide, which involved a two-hour "general exploratory search for evidence of a crime." *Id.* (internal quotations omitted). According to the Court, the initial cursory search was reasonable, whereas the officers should have obtained a warrant before conducting the in-depth investigatory search. *Id.* at 18–19. Here, the officers' search was comparable to the cursory search in *Thompson*. Knowing a person had likely been stabbed but not knowing who did it, they performed a prompt search of the home, presumably to see whether a killer or other victims were present. While assessing the emergency situation, the officers did not meticulously search the home for evidence of a crime. Their search was limited to addressing the emergency situation at hand. The officers had reasonable grounds for conducting a prompt, warrantless search of Defendant's home because of the ongoing emergency situation.

Finally, the officers had a reasonable basis for associating the emergency with Defendant's home. As noted, the officers noticed a set of fresh foot prints in the snow between

the scene and Defendant's home. (Narrative, 4, 6; Incident Report, 3). They also saw drops of blood in the snow near an open gate between the houses and blood on the door frame of Defendant's home. (*Id.*). Based on this evidence, any reasonable officer would find probable cause to connect the emergency with Defendant's home. As a result, the emergency exception applies to the officers' search of Defendant's home.

### 3.   Scope of the Search

Although the emergency situation justified the officers' entry into Defendant's home and a cursory search of it, their search of papers on the table in Defendant's home exceeded the scope of a reasonable search. Even when the emergency exception justifies entry into a home, officers may only "seize any evidence that is in plain view during the course of their legitimate emergency activities." *Mincey*, 437 U.S. at 393. Indeed, "a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26 (1968)). "'To fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent.'" *Stafford*, 416 F.3d at 1076 (quoting *Roe v. Sherry*, 91 F.3d 1270, 1272 (9th Cir. 1996)); *see also Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). "The second requirement . . . focuses on whether the officers had 'probable cause to believe they were associated with criminal activity.'" *Id.* (quoting *Horton v. California*, 496 U.S. 128, 131, n.1 (1990)).

Here, the first requirement is satisfied because the officers lawfully entered Defendant's home based on the emergency exception. However, the incriminatory nature of papers resting on

1   a table is not immediately apparent. The officers could not have known whether the papers

2   contained incriminating evidence simply by glancing at them during a cursory search.

3   Furthermore, searching the papers had no relation to searching the house for victims, a killer, or

4   weapons. Thus, the officers' search of the papers exceeded the scope of the plain view exception.

5        The inevitable discovery doctrine excuses the search of the papers. The inevitable

6   discovery doctrine is an exception to the exclusionary rule of the Fourth Amendment. *Nix v.*

7   *Williams*, 467 U.S. 431, 440-41 (1984). Under this doctrine, "if the government can establish by

8   a preponderance of the evidence that the unlawfully obtained information 'ultimately or

9   inevitably would have been discovered by lawful means,' the exclusionary rule will not apply."

10  *United States v. Camou*, 773 F.3d 932, 943 (9th Cir. 2014) (quoting *Nix*, 467 U.S. at 444).

11       Here, the Government inevitably would have discovered the papers if the warrantless

12  search had not occurred. Following Defendant's arrest, the officers secured the property and

13  established it as a crime scene. (Incident Report, 4). The next day, the FBI obtained a search

14  warrant, (Warrant Appl., 11-18, ECF No. 22-1), searched Defendant's house, and seized the

15  papers, among other items. (Mot. to Suppress, 2, ECF No. 22). Nothing would have prevented

16  the Government from searching Defendant's home the next day and seizing the papers.

17       Defendant argues the Government would not have inevitably discovered the papers

18  because the warrant application contained tainted evidence. "The mere inclusion of tainted

19  evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to

20  the warrant," *United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987), but "[a] reviewing court

21  should excise the tainted evidence and determine whether the remaining, untainted evidence

22

23

24                                                 30 of 33

would provide a neutral magistrate with probable cause to issue a warrant." *Id.* Here, the papers were the only tainted evidence obtained. The warrant application does not mention the papers other than to request their seizure. (Warrant Appl., 18). Thus, excising the papers from the application would not diminish probable cause to issue a warrant. Defendant also argues the account in the affidavit supporting the warrant application misrepresents what actually occurred; however, after examining the body camera video and the officers' accounts of what occurred, the assertions in the affidavit, even if imperfect, presented a reasonably accurate summary of the events that transpired.

In summary, Defendant consented to the officers' entrance into his home, and even if he did not, the emergency exception allowed the officers to enter his home without a warrant or his consent. Although the officers' search of the papers exceeded the scope of the plain view exception, the Government inevitably would have discovered the papers during its legal, warrant-based search the following day. As a result, the papers and all other evidence seized in Defendant's home were not the fruit of an illegal search and are admissible at trial.

### 4. Exigent Circumstances

Relying on the emergency exception, the Government only briefly refers to the exigent circumstances exception. The Court need not address the exigent circumstances exception because Defendant consented to the search, or, alternatively, the emergency exception applies.

The Court denies the motion.

///

///

**CONCLUSION**

IT IS HEREBY ORDERED that Defendant's Motion to Require Introduction of Evidence Under 404(b) (ECF No. 15) is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion to Order the United States to Inspect and Produce the Personnel Files of Federal Law Enforcement Officers and Task Force Officers (ECF No. 16) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that Defendant's Motion to Strike Surplusage from the Indictment (ECF No. 17) is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion to Use the Elko Division Master Jury Wheel (ECF No. 18) is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion to Permit Attorneys to Ask Further Questions of Jurors Under Rule 24(a) (ECF No. 19) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Use a Case-specific Jury Questionnaire (ECF No. 20) is DENIED.

IT IS FURTHER ORDERED that Defendant's Motion to Suppress Statements for Fifth Amendment Violations (ECF No. 21) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Motion to Suppress Evidence for Fourth Amendment Violations (ECF No. 22) is DENIED.

IT IS SO ORDERED.

Dated this 28th day of January, 2016.

_____
ROBERT C. JONES
United States District Judge